## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| Lakesha King, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action File No.: |
| | ) | |
| v. | ) | |
| | ) | |
| Transportation Alliance Bank, Inc., | ) | **COMPLAINT** |
| | ) | **WITH JURY TRIAL DEMAND** |
| Defendant. | ) | |
| | ) | |

## PRELIMINARY STATEMENT

1.     The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. Congress enacted the Fair Credit Reporting Act, 15 U.S. Code § 1681, *et seq.* (the "FCRA") to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

2.     Under the FCRA, consumer reporting agencies are charged with two primary duties: the duty to follow reasonable procedures to assure maximum

1

possible accuracy of information when preparing consumer reports; and the duty to reasonably reinvestigate consumers' disputes of inaccurate information, and then appropriately correct or modify the disputed information. A consumer reporting agency's duty to reasonably reinvestigate consumers' disputes of inaccurate information explicitly includes the duty to notify the furnisher of the disputed information. This is because the furnisher of the disputed information stands in a better position to make a thorough investigation of the disputed information than the credit reporting agency.

3.     Under the FCRA, furnishers of information have two similar primary duties: to report complete and accurate information regarding the consumers about whom the furnishers report; and, upon receiving notice of a consumer's dispute from a consumer reporting agency, to conduct an investigation of the disputed information, and then modify, delete, or permanently block the reporting of that information as appropriate.

4.     Defendant compiles, maintains, and reports information concerning Plaintiff's credit-worthiness, credit-standing, credit capacity, character, and general reputation. That information is then made available for use by third-parties in credit transactions involving Plaintiff, for employment purposes, the underwriting of

insurance for Plaintiff, and even in connection with a determination of Plaintiff's eligibility for a license or other governmental benefit. Accordingly, and pursuant to various provisions of the FCRA, Plaintiff has a legally protected interest in Defendant fulfilling its perspective duties under the FCRA, so that the information reported and maintained by Defendant is done so in a manner which is fair and equitable to Plaintiff, with regards to the confidentiality, accuracy, and relevancy of that information.

5.     This action for damages is based on Defendant's false reporting on Plaintiff's credit file and/or consumer reports, failures to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff, and failures to conduct reasonable investigations and reinvestigations with respect to disputes of such information.

## PARTIES

6.     Plaintiff, Lakesha King, is a natural person who resides in Rockdale County, Georgia.

7.     Plaintiff is an individual and is, therefore, a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

8.   Defendant, Transportation Alliance Bank, Inc. (hereinafter "TAB") is a corporation formed under the laws of the State of Utah and registered to do business in the State of Georgia. TAB may be served with process via its registered agent, Corporation Service Company, at 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

9.   TAB regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer transactions, such as Plaintiff's transactions at issue in this lawsuit and described herein, and is, therefore, a "furnisher" as that term is used in 15 U.S.C. § 1681s-2.

## JURISDICTION AND VENUE

10.   This Court has federal question jurisdiction over Plaintiff's Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*., claims pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

11.   This Court has personal jurisdiction over Defendant pursuant to O.C.G.A. § 9-10-91(1) because, *inter alia*, Defendant frequently and routinely conducts business in the State of Georgia, including the conduct complained of herein.

12.     Pursuant to 28 U.S.C. § 1391, venue is proper in the Northern District of Georgia because a substantial part of the events or omissions giving rise to the claims occurred in this district.

13.     Pursuant to LR 3.1B(3), venue is proper in the Atlanta Division because Defendant maintains an agent for service of process within the Atlanta Division.

## ALLEGATIONS OF FACT

### Plaintiff's Bankruptcy Case

14.     On July 22, 2019, Plaintiff filed a Chapter 13 Voluntary Bankruptcy Petition in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, Case Number 19-61315 (the "Bankruptcy Case").

15.     In Schedule F of her Bankruptcy Petition, Plaintiff listed TAB as an unsecured creditor (the "Debt").

16.     On June 27, 2022, Plaintiff's Chapter 13 was converted to a Chapter 7.

17.     On October 20, 2022, the Bankruptcy Court entered an Order Discharging Debtor in Plaintiff's Bankruptcy Case as to all dischargeable debts, and the Bankruptcy Case was closed.

### Effect of Consumer Reports Which Contain Inaccurate or Misleading Information

18.     Under the FCRA, the term "consumer report" generally refers to:

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for:
>
> > i.   credit or insurance to be used primarily for personal, family, or household purposes;
> >
> > ii.  employment purposes; or
> >
> > iii. any other purpose authorized under section 1681b of this title.
>
> 15 U.S.C. § 1681a(d)(1).

19.   The information contained in a consumer report bears on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, and personal characteristics.

20.   The information contained in a consumer report can have a tremendous effect on the consumer; to name only a few, the report can impact the consumer's:

> a.   Eligibility for and terms for credit;
>
> b.   Potential for refinancing of existing credit;
>
> c.   Eligibility for leasing prospects;
>
> d.   Eligibility for utility services;
>
> e.   Eligibility for and the terms of insurance;

f.    Employment or potential employment;

g.    Accounts which are under collection or review;

h.    Eligibility for a license or other benefit granted by a governmental instrumentality, particularly where the instrumentality is required by law to consider an applicant's financial responsibility or status;

i.    Standing with potential investors or servicers; and

j.    Eligibility for individually-billed travel charge cards used by executive departments and agencies.

21.    The terms "consumer report", "credit report", and "consumer credit report" are used synonymously herein.

22.    Approximately two million consumer reports are issued by credit bureaus each day. See, Robert B. Avery, Paul S. Calem, and Glenn B. Canner, Federal Reserve Board, Division of Research and Statistics, and Raphael W. Bostic, University of Southern California, *An Overview of Consumer Data and Credit Reporting* (February 2003), p. 48-49, available at https://www.federalreserve.gov/pubs/bulletin/2003/0203lead.pdf, *archived at* https://perma.cc/DCY4-ZS6C (last accessed on December 12, 2022).

23.    In 2012, the Federal Trade Commission conducted a study regarding consumer credit reporting errors and determined that anywhere from 10 to 21 percent of consumers have confirmed errors on their consumer reports. Federal Trade Commission, *Report to Congress under Section 319 of the Fair and Accurate Credit Transactions Act of 2003* (December 2012), p. iv of Executive Summary, available at https://www.ftc.gov/sites/default/files/documents/reports/section-319-fair-and-accurate-credit-transactions-act-2003-fifth-interim-federal-trade-commission/130211factareport.pdf, *archived at* https://perma.cc/R3P4-FGV9 (last accessed on December 12, 2022).

24.    The FTC study found that not only do these errors adversely affect consumers' credit scores, but the estimated proportion of reports and consumers who experience a positive credit score change resulting from the *correction* of these errors is higher than previous estimates from the credit reporting industry. *Id.*

### *Credit Scoring*

25.    The Fair Isaac Corporation credit risk scoring system, commonly referred to as "FICO", is the leading credit scoring system and utilizes data reported by credit reporting agencies. See, https://www.myfico.com/credit-education/credit-scores/ (last accessed on December 12, 2022).

26.    The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores). *Id*.

27.    The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau, *Supervision and Examination Manual, Version 2* (October 2012), p. 53, available at http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf, *archived at* http://perma.cc/JF32-RFAA, (last accessed on December 12, 2022).

28.    FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and mix of accounts/types of credit accounts for 10% of a consumer's FICO score. See,

https://www.myfico.com/credit-education/whats-in-your-credit-score/, *archived at* https://perma.cc/E8Y3-F4AA (last accessed December 12, 2022).

29.    The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

30.    Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

31.    Incorrectly reporting the tradeline of Plaintiff's Debt—which was provided for by Plaintiff's Confirmed Bankruptcy Plan and discharged in Plaintiff's Bankruptcy Case—as charged off, without also properly noting that the Debt was included and discharged in Plaintiff's Bankruptcy Case, adversely affects Plaintiff's FICO scores, as it negatively misrepresents the Debt owed by Plaintiff.

32.    There is no established rule or threshold for classifying the significance of a credit score change as minor or major because the impact of a change in score is dependent on the current score. That is, a twenty-five-point change in a credit

10

score that keeps the consumer in a particular credit risk category may not have a large impact on the person's likelihood of receiving credit. However, a one-point change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's access to credit or the products and rates the consumer is able to secure.

33.    Consistent with FTC study, the Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. See,     https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report*/, archived at* https://perma.cc/9TQN-S5WP (last accessed December 12, 2022).

*Credit-Based Insurance Scoring*

34.    Other entities that regularly review consumer reports, and use the data contained therein, are insurance companies.

35.    Insurance companies use a scoring mechanism which is similar to, but distinct from, the "credit score" used by creditors.

36.    Credit-based insurance scores, like credit scores themselves, are numerical summaries of consumers' credit histories; credit-based insurance scores are typically calculated using a multitude of information, including, but not limited

11

to, the length and age of credit history and the use of certain types of credit. Federal Trade Commission, *Credit-Based Insurance Scores: Impacts on Consumers of Automobile Insurance* (July 2007), p. 11, available at

https://www.ftc.gov/sites/default/files/documents/reports/credit-based-insurance-scores-impacts-consumers-automobile-insurance-report-congress-federal-trade/p044804facta_report_credit-based_insurance_scores.pdf, *archived at* https://perma.cc/B2VQ-452N (last accessed September 3, 2018). As cited in *Ins. Inst. V. Commissioner*, 486 Mich. 370, 785 N.W.2d 67 (2010).

37.     Credit-based insurance scores evolved from traditional credit scores, and all major automobile insurance companies use credit-based insurance scores in some capacity; insurers use these scores to assign consumers to risk pools and to determine the premiums that they pay. *Id*. at 22.

38.     A Wallethub study determined that a change in credit scores caused a consumer's automobile insurance rates to rise by an average of 67% nationwide, and an average of 84% in Georgia. *2018's States Where Credit Scores Affect Car Insurance the Most – Credit Score & Car Insurance Report*, available at https://wallethub.com/edu/car-insurance-by-credit-score-report/4343/, *archived at* https://perma.cc/CSL8-D47Y (last accessed December 12, 2022).

39.     Homeowner's insurance companies also use credit scores to decide whether to issue policies, and on what terms. A higher credit score is taken to mean that a consumer is less of a risk, which, in turn, means the consumer is more likely to be able to obtain insurance, and pay less for it.

See     https://www.consumer.ftc.gov/articles/0152-credit-scores, *archived at* https://perma.cc/EB3D-54UP (last accessed December 12, 2022).

40.     The National Association of Insurance Commissioners ("NAIC") is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five U.S. territories. See, http://www.naic.org/index_about.htm (last accessed December 12, 2022).

41.     The NAIC advises consumers who find errors on their credit reports to contact the credit reporting company to have the errors corrected, as the errors can affect the consumer's credit-based insurance score. National Association of Insurance Commissioners, *Credit-Based Insurance Scores: How an Insurance Company Can Use Your Credit to Determine Your Premium*, available at http://www.naic.org/documents/consumer_alert_credit_based_insurance_scores.htm, *archived at* https://perma.cc/S4F2-9VTL (last accessed December 12, 2022).

42.     There are several different companies that create credit-based insurance score reports for insurers to use, including the Fair Isaac Corporation. In calculating credit-based insurance scores, FICO looks at five general areas it believes will best determine how an individual manage risks. *Id*.

43.     The following is a breakdown of what FICO considers in calculating credit-based insurance scores, and how much the information generally weighs in that calculation: payment history accounts for 40% of a consumer's of a consumer's FICO credit-based insurance score; debt/amounts owed accounts for 30% of a consumer's of a consumer's FICO credit-based insurance score; age/length of credit history accounts for 15% of a consumer's FICO credit-based insurance score; new credit/recent inquiries accounts for 10% of a consumer's of a consumer's FICO credit-based insurance score; and, mix of accounts/types of credit accounts for 5% of a consumer's of a consumer's FICO credit-based insurance score. *Id*.

### The CDIA Metro 2 Credit Reporting Standards

*The CDIA has Imposed Rigorous Industry Standards to Ensure FCRA Compliance*

44.     The reporting of consumer credit information, by credit reporting agencies ("CRAs") and data furnishers, is the foundation of credit risk scoring and impacts the financial lives of consumers in innumerable ways, including the

14

availability and cost of credit, housing opportunities, leasing prospects, insurance availability and cost, utility service, and even employment. Between two and three million consumer reports are issued by credit bureaus each day. See, http://www.cdiaonline.org/about.cfm (last accessed December 12, 2022).

45.     The Consumer Data Industry Association ("CDIA") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

46.     Because consumer credit reporting information is such sensitive data that has far reaching implications for most, if not all, consumers, the CDIA works together with CRAs to develop, maintain and enhance industry-standard reporting formats and guidelines.

47.     To further assist CRAs and data furnishers with performing their due diligence and reporting accurate, complete, and timely data, in satisfaction of the FCRA's legal requirements, the CDIA offers extensive training, education, and support to CRAs and data furnishers.

48.    The CDIA's extensive training and support offerings include FCRA certification programs for both CRAs and data furnishers, to assist each in maintaining compliance with FCRA regulations.

49.    Because standardized methods are of paramount importance to the accurate, complete and timely reporting of consumer credit data, the CDIA can and will revoke FCRA certification for failure to adhere to the standards set by the CDIA.

50.    In cooperation with the major CRAs, CDIA publishes the Metro 2 ("Metro 2") reporting standards to assist furnishers with their compliance requirements under the FCRA. CDIA's reporting products are used in more than nine billion transactions each year.

See, http://www.cdiaonline.org/about/index.cfm?unItemNumber=515 (last accessed December 12, 2022).

51.    The Metro 2 Format Task Force is comprised of representatives from Equifax, Experian, Innovis, and TransUnion, and is supported by the CDIA. Metro 2 Format Task Force's mission is to provide a standardized method for the reporting of accurate, complete and timely data, and has developed the Metro 2 standards. *Id.*

52.    In order to ensure compliance with the FCRA, and in furtherance of its mission, the Metro 2 Format Task Force has developed an industry standard (the

"Metro2 standard") for reporting consumer accounts that "will ensure the integrity and consistency of the credit information being reported."

53.     In the credit reporting industry, Metro 2 is widely known as the well-established industry standard, uniformly adopted by furnishers and CRAs alike.

54.     As such, viewers/users of consumer reports both expect and rely on the information contained in consumer reports to be reported in compliance with the Metro 2 standards.

55.     A deviation from the Metro 2 standards results in a reported item being incomplete and/or misleading to viewers/users of consumer reports.

56.     In fact, the existence of an "industry standard" itself—one which is uniformly adopted and contractually enforced—compounds errors because it gives more credibility to false reporting.

57.     Without the existence of Metro 2, a viewer/user of consumer reports *might* presume that the furnisher or CRA simply made a mistake with respect to erroneous, negative credit reporting.

58.     However, since viewers/users of consumer reports know that Metro 2 has layers of rules and checks to ensure accuracy, they are more likely to "blame" the consumer for the false, negative credit reporting.

59.    Thus, a deviation from the Metro 2 standards results in adverse consequences for the consumer.

60.    15 U.S.C. § 1681s-2(a)(2) requires furnishers of information to regularly correct and update the information they previously provided to consumer reporting agencies, to make sure the information is complete and accurate. Similarly, upon receiving notice from a consumer reporting agency of a consumer's dispute, 15 U.S.C. § 1681s-2(b)(1) requires furnishers of information to conduct reasonable investigations of a consumer's dispute of the completeness or accuracy of any information provided by the furnisher of information to a consumer reporting agency.

61.    The uniform adoption and implementation of the Metro 2 standards is the primary vehicle by which CRAs and furnishers ensure that they are in compliance with their respective duties to ensure that they maintain complete and accurate information under the FCRA.

62.    The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

63.    The Metro 2 standards are documented in the Credit Reporting Resource Guide ("CRRG"), an industry-standard publication produced and distributed by the CDIA.

64.    As an integral aspect of its duties under the FCRA, TAB is required to have in place adequate and reasonable policies and procedures for handling and investigation of disputed information.

65.    At all times relevant hereto, TAB adopted and implemented the Metro 2 format as a means of fulfilling its aforementioned duties under the FCRA.

66.    Furthermore, at all times relevant hereto, TAB incorporated, warranted, and or represented to all CRAs to which it reported that it had adopted and implemented the Metro 2 format for its reporting of consumer data, and would otherwise comply with Metro 2 and CDIA guidelines in its reporting of consumer information.

*The National CRAs and the Furnishers of Consumer Information Communicate Metro 2 Compliant Notices of Consumer Disputes and Responses, Respectively, Through the e-Oscar Reporting Platform*

67.    The FCRA requires CRAs to implement an automated reinvestigation system through which furnishers of information to the CRA may report the results

of a reinvestigation that finds incomplete or inaccurate information in a consumer's file. 15 U.S.C. § 1681i(a)(5)(D).

68.    To comply with the automated dispute reinvestigation requirements of the FCRA, Trans Union, Equifax, and Experian (the three major "National CRAs"), along with Innovis Data Solutions, Inc., developed and implemented a browser-based software system that allows the CRAs to electronically notify furnishers quickly and easily of disputed credit reporting information, and for furnishers to quickly and easily respond to such disputes following the furnisher's investigation of the disputed information.

69.    The system is commonly referred to as e-OSCAR (Online Solution for Complete and Accurate Reporting) and was designed to be Metro 2 compliant. See *http://www.e-oscar.org/* (last accessed December 12, 2022).

70.    The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Data Form ("AUD") processing, as well as other consumer-dispute-related processes. *Id*.

71.    The National CRAs, provide notice of a consumer's dispute to data furnishers in the ACDV format, and forward the ACDV to the furnisher through e-OSCAR.

72.   If a furnisher's investigation of a consumer's dispute determines that the information in dispute is incomplete or inaccurate, the FCRA requires the furnisher to correct the information not only with the CRA that sent the ACDV, but with all other CRAs to whom the furnisher reported that information. 15 U.S.C. § 1681s-2(b)(1)(D).

73.   The e-OSCAR system facilitates the furnisher's compliance with 15 U.S.C. § 1681s-2(b)(1)(D) by sending a "Carbon Copy" of an ACDV response "to each CRA with whom the [furnisher] has a reporting relationship" in addition to the response to the initiating CRA. See *https://www.e-oscar.org/implementation/about-us* (last accessed December 12, 2022).

74.   Additionally, a furnisher can manually correct a tradeline with a CRA other than the one that initiated a dispute by sending an AUD within e-OSCAR.

75.   The reporting of a proper CII code for a consumer's account ensures that the tradeline for that account accurately discloses that account's relationship to the bankruptcy case, and can suppress other statements about the account (i.e., "in collections", "charged off") which are inconsistent with its status with respect to the bankruptcy.

76.     While furnishers sometimes report derogatory information about an account during and after a bankruptcy, the reporting of an accurate CII code ensures that if such derogatory information is reported, it is either withheld from viewers of the report, or placed in its proper context relative to the consumer's bankruptcy.

77.     This is especially important, as not all accounts are included in and/or dischargeable by consumer bankruptcy.

78.     The failure to report an accurate CII code for an account which was discharged in bankruptcy, or is included in an active bankruptcy, can lead to a consumer's report containing derogatory information which would otherwise not be visible to viewers of the report, and render other portions of the report misleading, since a viewer would not be aware that the account is included in bankruptcy.

79.     Similarly, where an account which *is not* discharged or dischargeable in bankruptcy is reported with an incorrect CII indicator, the consumer's report can falsely indicate that the account is subject to bankruptcy or discharge, and suppress the consumer's positive history of making payments toward the account.

80.     These false impressions become even greater in the light of the universally adopted Metro 2 standards, which require that an account within, or discharged by, a consumer bankruptcy be identified as such.

## Plaintiff's TransUnion Consumer Report

81.     On or about June of 2023, Plaintiff obtained a copy of her consumer report as published by TransUnion.

82.     That report contained erroneous information as provided by TAB, and as published and reported by TransUnion.

83.     The relevant portion of the TAB tradeline showed the account as having a balance of $3,752.00 and open with overdue payments.

84.     The Account was in fact discharged in Plaintiff's Bankruptcy.

85.     Because the Debt is included in Plaintiff's Bankruptcy Case and provided for in the Confirmed Plan, the information described above was both false and misleading in a number of key respects (the "Inaccurate Reporting"), including, *inter alia*:

       a.     The Debt's current status is reported as open rather than as "Included in Bankruptcy"; and

       b.     The tradeline does not disclose the fact of Plaintiff's Bankruptcy Case or that the Debt is included in and subject to the Bankruptcy Case; and

c.   The tradeline was not reported in compliance with CDIA / Metro 2 standards.

86.   In a letter dated June 13, 2023, Plaintiff disputed the inaccurate and misleading information directly to TransUnion and advised TransUnion that her account was included and discharged in her bankruptcy.

87.   The dispute letter provided Defendant with sufficient information to identify and correct the inaccurate reporting.

88.   In support of Plaintiff's dispute, and to assist Defendant's investigation, Plaintiff included with her dispute the following documents: a copy of the Order of Discharge exempting debts such as that held by TAB from discharge.

89.   Pursuant to 15 U.S.C. § 1681i, TransUnion had a duty to notify TAB of Plaintiff's dispute within five business days of receiving the dispute, to forward the supporting documents submitted with Plaintiff's dispute for TAB's review, to conduct a reasonable reinvestigation of the disputed information, and to correct the tradeline or delete it from Plaintiff's consumer file.

90.   Upon information and belief, TransUnion timely notified TAB of Plaintiff's dispute, via e-OSCAR or otherwise, and provided the supporting documents submitted with Plaintiff's dispute.

91.    Plaintiff did not receive a response to her dispute, so she resubmitted her dispute to Trans Union on July 25, 2023.

92.    Plaintiff accessed her TransUnion report again in September of 2023.

93.    The September 2023 TransUnion report reported the TAB account as being "charged off" with a balance of $3,752.00.

94.    The tradeline did not report that the account was included in the bankruptcy.

95.    The tradeline did not report the account as disputed.

96.    Defendant's post-investigation reporting is, independently and jointly, false and misleading.

97.    Defendant's post-investigation reporting is in derogation of the Metro 2 reporting standards, and that departure and failure to adhere to the adopted guidelines renders the reporting both false and materially misleading, as users of consumer reports assume Defendant's compliance with Metro 2 standards in reporting consumer information.

98.    Plaintiff is informed and believes that the revised tradeline reflects any information provided by TAB to TransUnion in response to Plaintiff's dispute.

## **INJURIES-IN-FACT**

99.    Defendant's actions and omissions have caused Plaintiff to lose time attempting to correct the false information on Plaintiff's consumer reports.

100.    The time spent by a person attempting to correct a false credit report constitutes a concrete injury for purposes of an FCRA claim. *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 16-17107, 2019 U.S. App. LEXIS 33662, at *5 (11th Cir. Nov. 12, 2019), citing Pedro v. Equifax, Inc., 868 F.3d 1275, 1280 (11th Cir. 2017).

101.    Defendant's actions and omissions have resulted in the illegitimate suppression of Plaintiff's FICO credit scores and other credit rating model scores.

102.    The adverse effect on Plaintiff's credit scores places Plaintiff at the material risk of being denied credit or receiving less favorable credit terms than she otherwise would.

103.    Further, the Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *Pedro v. Equifax, Inc*., 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir.

2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate"); *Santangelo v. Comcast Corp*., 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing"); *Binns v. Ocwen Loan Servicing, LLC*, No. 14-01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered intangible harms"); *Rothman v. U.S. Bank Nat'l Ass'n,* No. 13-03381, 2014 U.S. Dist. LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014) ("Injury to a credit score is sufficient to constitute 'actual damages'"); *Green v. RentGrow, Inc*., No. 2:16cv421, 2016 U.S. Dist. LEXIS 166229 ("A decrease in credit score may still establish an injury in fact sufficient to confer standing"); *Adams v. Fifth Third Bank*, No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D. Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit scores … are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III."); and, *Coulbertson v. Experian Info. Sols., Inc*., No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS 69484 (N.D. Cal. Mar. 24, 2017) ("At a minimum, Coulbertson has alleged

a sufficient injury-in-fact through her claim that her credit score suffered as a result of the credit report she disputes").

104.   Defendant's actions and omissions have resulted in the illegitimate suppression of Plaintiff's credit-based insurance scores.

105.   The adverse effect on Plaintiff's credit-based insurance scores places Plaintiff at the material risk of being denied insurance or receiving less favorable insurance rates and terms than she otherwise would.

106.   Defendant's actions and omissions have falsely suggested to any viewer of Plaintiff's TransUnion credit report that the Debt was in active collections, rather than being provided for in Plaintiff's active Bankruptcy Case.

107.   This false impression creates a material risk that Plaintiff would be denied credit, receive less favorable credit treatment than Plaintiff otherwise would, or receive other unfavorable treatment than Plaintiff otherwise would, from any viewer of Plaintiff's TransUnion credit report engaged in judgment-based lending.

## **DAMAGES**

### **Actual Damages**

108.   As a result of Defendant's actions and omissions, Plaintiff has suffered actual damages.

109.   These damages include out-of-pocket expenses incurred as a result of Defendant's wrongful representations regarding the Debt, and Defendant's failures to abide by their obligations under the FCRA.

110.   Plaintiff has suffered a decrease in Plaintiff's credit scores as a result of Defendant's wrongful representations regarding the Debt and Defendant's failures to abide by their obligations under the FCRA.

111.   Plaintiff has also experienced aggravation, frustration, and stress due to the fact that Defendant is thwarting Plaintiff from receiving the Fresh Start guaranteed by bankruptcy process and discharge.

## Statutory and Punitive Damages

112.   At the time Defendant reported the information at issue in this matter, Defendant had actual notice that the information it was reporting regarding Plaintiff and the Debt was false, deceptive, and misleading.

113.   For example, Plaintiff included corroborating documents which was more than sufficient to establish that the disputed information was being reported inaccurately.

114.   Defendant had more than enough information to correct its false, deceptive, and misleading reporting.

115.   Despite that, Defendant continued to report the false, deceptive, and misleading information regarding Plaintiff and the Debt.

116.   Defendant failed to correct its false, deceptive, and misleading reporting, and in fact continued to report false, deceptive, and misleading information regarding Plaintiff, as described herein.

117.   Accordingly, Defendant's conduct was willful.

118.   As a result of Defendant's willful actions and omissions, Plaintiff is eligible to recover actual damages or statutory damages of up to $1,000, potential punitive damages, costs of this action, and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and/or 1681o.

## CAUSES OF ACTION

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681s-2(b)
### Transportation Alliance Bank

119.   Plaintiff incorporates by reference paragraphs 1 through 118 as though fully stated herein.

120.   Pursuant to 15 U.S.C. § 1681s-2(a), TAB is responsible for providing accurate information whenever it furnishes information to any consumer reporting agencies.

121.   Upon information and belief, TransUnion timely notified TAB of Plaintiff's dispute, and provided TAB with all the relevant information that Plaintiff had submitted.

122.   Pursuant to 15 U.S.C. § 1681s-2(b), TAB had a duty to investigate Plaintiff's dispute and accurately report its findings to TransUnion.

123.   A furnisher's investigation must be a good faith effort to ascertain the truth; a reasonable investigation must answer the substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

124.   A reasonable investigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

125.   The reasonableness of an investigation under the FCRA is generally a question of fact for the jury.

126.   In order to conduct a reasonable investigation, and pursuant to 15 U.S.C. § 1681s-2(b), TAB was required to review and consider all relevant information submitted by Plaintiff to TransUnion.

127.   Plaintiff's disputes were clear and unambiguous as to the inaccuracies of reporting the Debt.

128.   TAB breached its duties as described herein.

129.   If TAB had conducted a reasonable investigation of Plaintiff's disputes, TAB would have reviewed and considered all of the information Plaintiff submitted to TransUnion in her disputes, and would have easily detected that what was being reported regarding the Debt was factually incorrect, inaccurate, and misleading.

130.   If TAB had conducted a reasonable investigation of Plaintiff's disputes, the tradeline on Plaintiff's consumer reports would have been corrected accordingly.

131.   Due to TAB's failures to provide accurate information, and failures to conduct reasonable investigations of Plaintiff's disputes, the false and misleading information in Plaintiff's credit file and on Plaintiff's reports as described herein was not appropriately modified.

132.   TAB had all the information necessary to correct its reporting. Despite that, TAB failed to suitably correct its reporting, in the face of clear evidence that it was false and misleading. That failure indicates that TAB's investigation procedures were not reasonable.

133.   The fact that TAB had all the information necessary to correct its reporting, yet failed to appropriately do so, further indicates that TAB recklessly

disregarded Plaintiff's disputes and the requirements of the FCRA, amounting to a willful violation of the statute.

134.   TAB willfully, or in the alternative negligently, violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation upon receiving notice of Plaintiff's disputes from TransUnion, by failing to appropriately modify the disputed information, and/or by failing to appropriately report the results of its investigation, in reckless disregard of the statutory requirements, Plaintiff's disputes, and the publicly recorded Bankruptcy Case filings.

135.   As a result of TAB's violations of 15 U.S.C. § 1681s-2(b), Plaintiff has suffered actual damages as stated herein. Plaintiff is, therefore, entitled to recover actual damages from TAB under 15 U.S.C. §§ 1681n and 1681o.

136.   TAB's actions and omissions were willful, rendering TAB liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

137.   Plaintiff is entitled to recover costs and attorneys' fees from TAB pursuant to 15 U.S.C. §§ 1681n and 1681o.

## **TRIAL BY JURY**

138.   Plaintiff is entitled to and hereby requests a trial by jury.

33

**WHEREFORE**, Plaintiff prays that judgment be entered in her favor and against Defendant for:

a)     Plaintiff's actual damages;

b)     Statutory damages of $1,000 per violation of the FCRA pursuant to 15 U.S.C. § 1681n;

c)     Punitive damages pursuant to 15 U.S.C. § 1681n;

d)     Reasonable attorney's fees and costs pursuant to 15 U.S.C. §§ 1681n and/or 1681o; and

e)     Such other and further relief as may be just and proper.

Respectfully submitted this 8th day of November, 2023.

Counsel for Plaintiff

**BERRY & ASSOCIATES**

*/s/ Matthew T. Berry*
Matthew T. Berry
Georgia Bar No.: 055663
matt@mattberry.com
Telephone: (404) 235-3334
2751 Buford Highway, Suite 600
Atlanta, GA 30324

*/s/ Chris Armor*
Christopher N. Armor
Georgia Bar No. 614061

P.O. Box 509
Londonderry, Vermont 05148
Phone 651-208-6441
Fax 404-592-6102
chris.armor@armorlaw.com

*Counsel for Plaintiff*